UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCY
PADUCAH DIVISION
CASE NO. 5:12-CV-00199

JERALD MARION OLDHAM                                            PLAINTIFF

v.

EXTENDICARE HOMES, INC.
d/b/a SHADY LAWN NURSING HOME                          DEFENDANT

MEMORANDUM OPINION

This matter comes before the Court on the Defendant's motion to compel arbitration. (Def.'s Mot., Docket Number ("DN") 9.)  The Plaintiff responded.  (Pl.'s Resp., DN 15.)  The Defendant replied.   (Def.'s Reply, DN 16.)   Fully briefed, this matter is now ripe for adjudication.  For all of the following reasons the Defendant's motion is **GRANTED**.

I.

The facts giving rise to this action are largely undisputed.  Plaintiff Jerald Oldham ("Jerald") was a resident at Shady Lawn Nursing Home ("Shady Lawn") between November 22 and December 3, 2011.  During this short stay he fell and injured his knee at the facility.  Jerald alleges that Shady Lawn's negligence caused his injury.

Long before the events giving rise to this action occurred, Jerald executed a power of attorney in which he appointed Delores Oldham ("Delores") his attorney-in-fact.[1]  In that role, Delores signed and executed a number of documents relating to Jerald's admission to Shady Lawn in November of 2011.  Jerald did not execute any of the documents on his own behalf. Among the various documents signed by Delores is an Alternative Dispute Resolution Agreement ("arbitration agreement").  (Agreement, DN 9-1.)  Pursuant to its terms the parties "voluntarily agree[d] that any dispute covered by this Agreement (herein after referred to as

---

[1] The power of attorney was executed on July 12, 2000.  (Power of Attorney, DN 9-2, p. 1.)

1

'Covered Disputes') that may arise between the Parties shall be resolved exclusively by an ADR process that shall include mediation and, where mediation does not successfully resolve the dispute, binding arbitration." (*Id.*) Paragraph Four lists the "Covered Disputes" that are subject to arbitration:

> This Agreement applies to any and all disputes arising out of or in any way relating to this Agreement or to the Resident's stay at the Center that would constitute a legally cognizable cause of action in a court of law sitting in the Commonwealth of Kentucky and shall include, but not be limited to, all claims in law or equity arising from one Party's failure to satisfy a financial obligation to the other Party; a violation of a right claimed to exist under federal, state, local law or contractual agreement between the Parties; tort; breach of contract; fraud; misrepresentation; negligence; gross negligence; malpractice; death or wrongful death and any alleged departure from any applicable federal, state, or local medical, health care, consumer or safety standards.

(*Id.* at p. 2.) In its present motion, Shady Lawn seeks to compel arbitration of Jerald's allegations arising in tort, negligence, and gross negligence, all of which are "Covered Disputed" under the terms of the arbitration agreement.

Three other provisions in the agreement are worthy of note. First, Paragraph Fourteen reflects the "Resident's Understanding" and states:

> The Resident understands that he/she has the right to seek advice of legal counsel and to consult with a Center representative concerning this Agreement. The Resident understands that this Agreement is **not a** condition of admission to or continued residence in the Center.
>
> **THE PARTIES UNDERSTAND, ACKNOWLEDGE, AND AGREE THAT BY ENTERING INTO THIS AGREEMENT THEY ARE GIVING UP THEIR CONSITUTIONAL RIGHT TO HAVE THEIR DISPUTES DECIDED BY A COURT OF LAW OR TO APPEAL ANY DECISION OR AWARD OF DAMAGES RESULTING FROM THE ADR PROCESS EXCEPT AS PROVIDED HEREIN. THIS AGREEMENT GOVERNS IMPORANT LEGAL RIGHTS. YOUR SIGNATURE BELOW INDICATES YOUR UNDERSTANDING OF AND AGREEMENT TO THE TERMS SET OUT ABOVE. PLEASE READ IT COMPLETELY, THROUGHLY AND CAREFULLY BEFORE SIGNING. Initial: _____ Resident**

(*Id.* at p. 4). This paragraph was initialed by Delores. (*Id.*) Second, immediately before the

2

signature block, the arbitration agreement provides:

> **BY SIGNING THIS AGREEMENT, the Parties acknowledge that (a) they have read this Agreement; (b) have had an opportunity to seek legal counsel and to ask questions regarding this Agreement; and (c) they have executed this Agreement voluntarily intending to be legally bound there to this 22nd day of November, 2011 (the "Effective Date").**

(*Id.* at p. 5.)   Following this acknowledgment, the agreement is signed by Delores, as Jerald's legal representative, and by Shady Lawn.   (*Id.*)   Finally, Paragraph Thirteen granted Jerald thirty days to revoke, but the "Agreement, if not revoked within that time frame, shall remain in effect for all care and services rendered to the Resident at or by the Center . . . ."   (*Id.* at 4.)   Jerald does not claim that he revoked the arbitration agreement within thirty days of execution.

In response to Shady Lawn's motion to compel arbitration, Jerald argues that the arbitration agreement is not binding on him because the power of attorney did not vest Delores with the authority to enter into the agreement on his behalf.   The power of attorney provides, in relevant part, that Delores is granted authority to:

> [1] make contracts, lease, sell, and convey any real or personal property that I may now have or hereafter own; . . . [2] draw, make and sign any and all checks, contracts, or agreements; . . . [3] institute or defend suits concerning my property or gifts; [and 4] generally to do and perform for me and in my name all that I might do if present, and I hereby adopt and ratify all of the acts of my said attorney done in pursuance of the power hereby granted, as fully as if were present acting in my own person . . . .

(Power of Attorney, DN 9-2, p. 1.)   Resolution of the current motion turns on the interpretation given to these provisions in the analysis below.

## II.

The terms of the arbitration agreement explicitly state that it is governed by both the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and the Kentucky Uniform Arbitration Act, KRS § 417.045 *et seq.*   (Agreement, DN 9-1, p. 2.)   The Acts are substantially similar and both provide

that a provision in a written contract to submit a controversy arising from the terms of that contract to arbitration will be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; KRS § 417.050.

The federal act was designed to "override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citations omitted). In the face of a motion to compel arbitration, "a federal court must determine whether the parties agreed to arbitrate the dispute at issue." *Id.* (citation omitted). To do so, courts "examine the language of the contract in light of the strong federal policy in favor of arbitration." *Id.* (citation omitted). Where ambiguities or doubts exist as to whether the parties intended to arbitrate, such "should be resolved in favor of arbitration." *Id.* (citation omitted).

If, upon examination, "the district court is satisfied that the agreement to arbitrate is not 'in issue,' it must compel arbitration." *Great Earth Cos., Inc. v. Simon*, 288 F.3d 878, 889 (6th Cir. 2002). If, however, "the validity of the agreement to arbitrate is 'in issue,' the court must proceed to trial to resolve the question." *Id.* (citing 9 U.S.C. § 4). To show that the agreement to arbitrate is "in issue," the party opposing arbitration "must show a genuine issue of material fact as to the validity of the agreement to arbitrate." *Id.* (citation omitted). This standard mirrors the summary judgment standard. *Id.*

A court may consider state law when determining the validity of an arbitration agreement if the state law "arose to govern issues concerning the validity, revocability, and enforceability of contracts, although the FAA preempts state law applicable *only* to arbitration provisions." *Id.* (quotations omitted). "Therefore, state law governs generally applicable contract defenses [to an arbitration agreement], such as fraud, duress, or unconscionablility." *Id.* (quotation omitted).

### III.

Shady Lawn's motion to compel arbitration must be granted for two interrelated reasons: the personal injury claim asserted by Jerald falls within the scope of the arbitration agreement, and the power of attorney vested Delores with the authority to enter into the arbitration agreement on Jerald's behalf.

The arbitration agreement clearly applies to all tort, negligence, and gross negligence actions asserted by a resident on whom the agreement is binding.  (*See* Agreement, DN 9-1, p. 2 ("Covered disputes" include actions for "tort; . . . negligence; [and] gross negligence").  Jerald does not argue that the agreement is inapplicable because his causes of action are beyond its scope.  Rather, he argues that the arbitration agreement is not binding because Delores acted beyond the authority granted to her as his attorney-in-fact when she signed the agreement on his behalf.

Upon examination of its terms, the Court finds that the power of attorney vested Delores with authority to bind Jerald to the arbitration agreement.  Among the various grants of authority in the power of attorney, Delores was given the power to "draw, make and sign any and all checks, contracts, or agreements" on Jerald's behalf.  (Power of Attorney, DN 9-2, p. 1.)  The arbitration agreement to participate in alternative dispute resolution for any tort, negligence, or gross negligence is undoubtedly a "contract" or "agreement" that Delores had authority to "make and sign."  Based on a plain reading of the power of attorney, it is clear to the Court that Delores was granted the authority to enter into the arbitration agreement on Jerald's behalf.

In an attempt to avoid the Court's conclusion, Jerald argues that the Kentucky Supreme Court's decision in *Ping v. Beverly Enterps., Inc.*, 376 S.W.3d 581 (Ky. 2012), counsels against compelling arbitration.  *Ping* arose under facts similar to those in the present action.  Donna Ping

5

served as the attorney-in-fact for her mother, Mrs. Duncan.  *Id.* at 586.  In that role, Ping entered

into an arbitration agreement on behalf of her mother with the nursing home where Mrs. Duncan

was a resident.  *Ping*, 376 S.W.3d at 587-88.  When Mrs. Duncan died in the facility, Ping

brought a wrongful death action on behalf of the estate.  *Id.* at 586.  The nursing home sought to

compel arbitration of the claim under the terms of an arbitration agreement Ping signed on her

mother's behalf upon admission to the facility.  Ultimately, the Kentucky Supreme Court refused

to compel arbitration, finding the power of attorney did not vest Ping with authority to execute

the arbitration agreement on behalf of her mother.  *Id.* at 594.

Arriving at this outcome, the court examined the terms of the "General Power of

Attorney" Mrs. Duncan granted to Ping.  The document granted Ping authority over two aspects

of Mrs. Duncan's affairs.  Ping was authorized make financial decision on behalf of her mother,

including

> acts pertaining to the management of Mrs. Duncan's property and finances, such
> as 'tak[ing] possession of any and all monies, goods, chattels, and effects
> belonging to me, wheresoever found; . . . receiv[ing], deposit[ing], invest[ing] and
> spend[ing] funds on my behalf; . . . tak[ing] charge of any real estate which I may
> own in my own name or together with other owners, legally or equitably, and to
> mortgag[ing], convey[ing] or sell[ing] said real estate and perform[ing] any acts
> necessary to mortgage, convey or sell said real estate.

*Id.* at 586-87.  The power of attorney also granted Ping the authority to make medical decisions

for her mother's care, including

> any and all decision of whatever kind, nature or type regarding my medical care,
> and to execute any and all documents, including but not limited to authorizations
> and releases, related to medical decisions affecting me; and to generally do any
> and every further act and thing of whatever kind, nature, or type required to be
> done on my behalf.

Although the power of attorney contained a "catch-all" that granted Ping authority "to do and

perform, all, and every act and thing whatsoever requisite and necessary to be done, to and for all

6

intents and purposes as I might or could do if personally present," the court refused to find that the catch-all allowed Ping to execute the arbitration agreement. *Id.* at 586. The court reasoned that "Mrs. Duncan's power of attorney relate[d] expressly and primarily to the management of her property and financial affairs and to ensuring that health-care decisions could be made on her behalf." *Id.* at 592. The "catch-all" provision "did not give Ms. Ping a sort of universal authority beyond those express provisions." *Id.*

After examining the scope of authority granted in the power of attorney, the court concluded that the document only authorized Ping to make financial and health-care decisions for her mother. The decision to sign the arbitration agreement was not a health-care decision because it was not a prerequisite for admission to the nursing home. *Id.* at 593. The court also concluded that it was not a financial decision. *Id.* at 594 (citing *Dickerson v. Longoria*, 995 A.2d 721 (Md. 2010); *Carrington Place of St. Pete, LLC v. Estate of Milo*, 19 So. 3d 340 (Fl. Dist. Ct. App. 2009)). In all, Ping lacked authority to enter into the arbitration agreement because "[a]bsent authorization in the power of attorney to settle claims and disputes or some such express authorization addressing dispute resolution, authority to make such a waiver will not be inferred lightly." *Id.* at 593.

*Ping* is distinguishable from the present action for one obvious and significant reason: the power of attorney in *Ping* did not contain an express provision granting the attorney-in-fact authority "to draw, make and sign any and all checks, contracts, or agreements." This clause, as contained in Jerald's power of attorney, grants Delores authority to act beyond the categories of healthcare or financial decisions. If such language would have been included in the power of attorney at issue in *Ping*, it is highly likely that the Kentucky Supreme Court would have enforced the arbitration agreement.

7

*Ping* was correctly decided because the power of attorney did not grant the attorney-in-fact authority to enter into the arbitration agreement.  Unlike *Ping*, the power of attorney in the present action vested Delores with authority to enter into contracts on Jerald's behalf.  Such contracts include the arbitration agreement.  Reading the power of attorney according to its explicit terms and in light of the strong federal policy favoring arbitration, the Court finds that Delores had authority to execute the arbitration agreement on behalf of Jerald.  Jerald's claims for tort, negligence, and gross negligence are included within the terms of the arbitration agreement.  In the face of a valid arbitration agreement and Delores's authority to execute it on behalf of Jerald, the Court is required by the Federal Arbitration Act and the Kentucky Uniform Arbitration Act to grant Shady Lawn's motion to compel arbitration.

## IV.

In anticipation of the Court's holding, Jerald also argues that the motion to compel should be denied because a question of fact remains as to whether the he was under a disability at the time Delores signed the arbitration agreement.  According to Jerald, the durable power of attorney at issue "only creates a binding agency during a disability or incapacity."  (Pl.'s Resp., DN 15, pp. 8-9.)  In other words, Delores lacked authority to act under the power of attorney unless Jerald was incapacitated.  Such a determination, Jerald argues, is a question of fact that prohibits the Court for granting the motion to compel arbitration at this stage.  The Court disagrees.  The language of the power of attorney signed by Jerald granted Delores authority to act according to its terms at the moment of its execution and did not require a determination of disability or incapacity.

On this issue Jerald's power of attorney provides:

This power of attorney shall not be affected by my disability and shall be exercised by my said appointed attorney in fact notwithstanding any later

8

> disability or incapacity or incompetence I might suffer, or any uncertainty to as whether I am dead or alive; and if any of said events shall occur, any acts done subsequent thereto by my said attorney in fact pursuant to this power of attorney shall have the same effect and inure to the benefit of and bind me, my heirs, devisees and personal representatives as if I were alive, competent and not disabled.

(Power of Attorney, DN 9-2, p. 1.)   A plain reading of this provision demonstrates that the authority granted to Delores became effective at the time of execution and was not contingent on a determination of disability.   Again, the provision states, "This power of attorney *shall not* be affect by my disability" and "shall be exercised by my said appointed attorney in fact *notwithstanding* any *later* disability or incapacity or incompetent I might suffer[.]"   (*Id.* (emphasis added).)   This language demonstrates that the power of attorney was effective at the time of execution and that the authority granted therein would not be affect by any future disability.   Nothing in the language supports Jerald's position that the authority granted was contingent upon a showing of disability.

The Court's interpretation is supported by Kentucky's durable power of attorney statute, KRS § 386.093.  That section contemplates the creation of a durable power of attorney by use of one of two written phrases.   First, a principal can create a durable power of attorney if "the writing contains the words, 'This power of attorney shall not be affected by subsequent disability of the principal, or lapse of time[.]'"   KRS § 386.093(1).   Second, a durable power of attorney can also be created by use of the words "'This power of attorney shall become effective upon the disability or incapacity of the principal[.]'"   *Id.*   Under the first formulation, the power of attorney becomes effective upon execution, but under the second, the grant of authority is contingent upon disability or incapacity.   Jerald's power of attorney uses the language authorized in the first formulation, not the second.

Furthermore, the Court's conclusion is supported by the fact that the power of attorney at

issue does not enumerate the conditions upon which the power would become effective.  "If the power of attorney is to become effective upon the disability or incapacity of the principal, the principal may specify the conditions under which the power is to become effective and may designate the person, persons, or institution responsible for making the determination of disability or incapacity."  KRS § 386.093(5).  "If the principal fails to so specify, the power shall become effective upon a written determination by two (2) physicians that the principal is unable . . . to prudently manage or care for the principal's person or property[.]"  *Id.*  Again, nothing in the power of attorney at issue indicates that it is contingent upon Jerald experiencing a disability. Rather, it was effective upon execution, and Jerald's arguments to the contrary are without merit.

## CONCLUSION

Defendant Shady Lawn Nursing Home moved the Court for an order compelling arbitration pursuant to the arbitration agreement executed between it and Plaintiff Jerald Oldham. For all of the foregoing reasons, the Defendant's motion is **GRANTED**.  An appropriate order and judgment shall issue separately from this memorandum opinion.